UNITED STATES of America,
Plaintiff–Appellee,

v.

John Wesley SCRIVENER,
Defendant–Appellant.

No. 98–50513.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1999.

Decided Aug. 30, 1999.

As Amended Nov. 10, 1999.

Jay L. Lichtman, Los Angeles, California, for defendant-appellant.

Daniel Saunders, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.

Before: BRUNETTI, WARDLAW, and W. FLETCHER, Circuit Judges.

WARDLAW, Circuit Judge:

John Wesley Scrivener pleaded guilty to nine counts of wire fraud and aiding and abetting in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2(a). After enhancing Scrivener's sentence and denying a downward adjustment for acceptance of responsibility under the United States Sentencing Guidelines, the district court sentenced Scrivener to forty-two months of imprisonment, a three-year term of supervised release, and payment of a $9,000 fine. Scrivener appeals his sentence. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we affirm.

I

On October 29, 1998, law enforcement officers approached John Scrivener and his son, Jade, at a car wash in Costa Mesa, California. When one of the officers identified himself, Jade Scrivener ran. After a brief foot chase, the police apprehended and arrested the fleeing suspect. Retracing the path of flight, the police retrieved a package sent by a woman named Shirley Coakley. The package contained three money orders totaling $1,450.

As police officers chased his son, John Scrivener was observed removing a black leather day planner from his pickup truck and placing it in a trash can. Before he was arrested, he attempted to conceal the planner in the trash can by setting other items on top of it. Inside the planner the police found Jade Scrivener's identification, numerous pre-paid telephone calling cards, business cards for mailbox rental locations, and a "lead sheet" containing names, telephone numbers, and corresponding cash amounts obtained from the persons so identified.

The arrests of John and Jade Scrivener ended their fraudulent, two-month telemarketing scheme. Under this scheme, the Scriveners would telephone senior citizens and "inform" them that they had won large sums of money. The Scriveners instructed the victims to send a certain amount of money to a rented mailbox, falsely representing that this money served as advance payment for taxes, processing fees, and attorney's fees associated with the cash prize. After they had induced the elderly victims to send the money, the Scriveners never sent the promised reward.

The Scriveners devised a simple strategy to avoid detection. They would place the fraudulent telephone calls from various motel rooms in the Costa Mesa area, always using pre-paid telephone calling cards. They directed that payments be sent to private mailboxes rented under various false names. These false names included monikers such as "Peter C. Holston" or "PCH," which are also the initials for "Publisher's Clearing House." In this fashion, the Scriveners duped their elderly victims into believing that they were sending payments to Publisher's Clearing House when, in actuality, they were sending money to the Scriveners.

A phone call placed to seventy-five-year-old Rose Packer precipitated a series of events that culminated in the Scriveners' arrests. One of the Scriveners called Ms. Packer and instructed her to send $12,000 to an address in Costa Mesa. The address was actually a mailbox drop location rented by Jade Scrivener. Working with law enforcement authorities, Ms. Packer sent an empty "dummy package" to the stated address. On the morning of October 29, 1997, police observed Jade Scrivener pick up the dummy package from the mailbox drop. Later that day, Jade Scrivener returned to the mailbox drop to pick up the package containing Shirley Coakley's three money orders. After picking up the package, Jade Scrivener got into a pickup truck driven by his father and drove to the car wash where the two were eventually arrested.

On April 10, 1998, a federal grand jury in the Central District of California returned a nine-count first superseding indictment against defendant John Scrivener and his son. Three days later, John Scrivener pleaded guilty to all counts of the first superseding indictment.

At the sentencing hearing on August 10, 1998, the district court found that the base offense level for a violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2(a) is six. *See* U.S.S.G. § 2F.1.1(a). The district court also determined that several specific offense characteristic adjustments applied. First, the court imposed a nine-level increase under U.S.S.G. § 2F1.1(b)(1)(J), finding that the amount of loss was between $350,000 and $500,000. Second, the court imposed a two-level enhancement under U.S.S.G. § 3A1.1(b) because Scrivener knowingly defrauded vulnerable victims and a two-level enhancement under U.S.S.G. § 2F1.1(b)(2) because the offense involved more than minimal planning and/or a scheme to defraud multiple victims.

The district court then denied Scrivener a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. The court found:

> I find that the defendant John Wesley Scrivener has not accepted full responsibility for his actions in this case. He tries to put it off on his son, and I think there may be some reason because somehow or other they think that if it's a younger man who's going to take the blame, that there probably would be a lesser sentence involved with that person. And I think this investigation has just bared the tip of the iceberg of this scheme.

The district court also determined that a two-level upward departure was appropriate under U.S.S.G. § 5K2.0, reasoning:

> I think old people, and particularly old people, most of whom, at least in what I have had, over 70 are much more prone to a situation in which they are going to get a prize now of money as opposed to some kind of investment that is usually the schemes in which people in telemarketing are involved, or in other matters in which they're going to get some kind of goods rather than money, be-

cause I think they are particularly prone to that kind of thing, and I think the law has indicated that and is trying to make provision for that problem of gullibility.

The district court explicitly based the upward departure "on the rationale set forth in the government's sentencing papers."

Based upon an offense level of twenty-one, the applicable Sentencing Guidelines range for Scrivener's sentence was thirty-seven to forty-six months. The district court imposed a forty-two-month sentence of imprisonment and a three-year term of supervised release. The court also ordered Scrivener to pay a $9,000 fine and $16,350 in restitution to the victims of the fraudulent telemarketing scheme. Scrivener did not object to the imposition of the $9,000 fine.

John Scrivener now appeals the district court's sentencing decisions.[1]

II

Scrivener first contends that the district court erred in failing to apply a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. Second, he claims error in the loss amount calculation under U.S.S.G. § 2F1.1. Third, he contends that the district court erred in imposing a vulnerable victim enhancement under U.S.S.G. § 3A1.1(b). Fourth, he argues that the district court abused its discretion in imposing an upward departure pursuant to U.S.S.G. § 5K2.0. Finally, Scrivener asserts error in the imposition of the $9,000 fine. Each of these contentions lacks merit, and will be addressed below in turn.

A

 A district court's decision to adjust a defendant's sentence based on acceptance of responsibility is a factual determination reviewed for clear error. *See United States v. Villasenor–Cesar,* 114 F.3d 970, 973 (9th Cir.1997). "In review-

---

1. We granted Jade Scrivener's motion for voluntary dismissal of his related appeal on April 22, 1999.

ing a district court's determination as to a defendant's acceptance of responsibility, we must afford the district court 'great deference' because of its 'unique position to evaluate a defendant's acceptance of responsibility.' " *United States v. Fellows*, 157 F.3d 1197, 1202 (9th Cir.1998) (quoting *United States v. Casterline*, 103 F.3d 76, 79 (9th Cir.1996)).

▮▮▮ Under the Sentencing Guidelines in effect at the time of sentencing, a reduction for acceptance of responsibility was warranted if Scrivener "clearly demonstrate[d] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a); *see also United States v. Innie*, 7 F.3d 840, 848 (9th Cir.1993) (holding that defendant bears burden of showing entitlement to credit for acceptance of responsibility). The application notes for U.S.S.G. § 3E1.1(a) allow defendants to proffer the following three pieces of "significant evidence" to establish acceptance of responsibility: (1) plea of guilty before trial; (2) truthful admission of the elements of the offense; or (3) truthful admission, or at least no false denial, of "relevant conduct." U.S.S.G. § 3E1.1, App. Note 3. "A defendant who enters a guilty plea, however, is not entitled to [ ] an adjustment [for acceptance of responsibility] as a 'matter of right.' " *Fellows*, 157 F.3d at 1202 (quoting U.S.S.G. § 3E1.1, comment. (n.3)). "Although pleading guilty and truthfully admitting the elements of the offense and other relevant conduct are 'significant evidence of acceptance of responsibility,' this evidence may be outweighed by conduct 'inconsistent with such acceptance of responsibility.' " *Fellows*, 157 F.3d at 1202 (quoting U.S.S.G. § 3E1.1, App. Note 3) (additional citation omitted). One example of inconsistent conduct that weighs against a finding of acceptance of responsibility is a defendant's attempt to minimize his own involvement in the offense. *See United States v. Ramos*, 923 F.2d 1346, 1360 (9th Cir.1991). Such conduct was present here.

In *Ramos*, this court upheld the district court's denial of a finding of acceptance of responsibility where the defendant offered a "minimalist description of his involvement in the affair...." *Id.* "Two or three sentences did not [warrant a downward adjustment] ... given evidence which suggested a much deeper involvement in the scheme." *Id.* (internal alterations omitted). As in *Ramos*, the defendant here did not discuss his offense conduct with his Probation Officer. Instead, Scrivener relied on a brief written statement in which he acknowledged only that he was "present" in hotel rooms with his son when the fraudulent calls were made.

The record demonstrates numerous other instances where Scrivener, through his lawyer, attempted to portray himself as a passive participant in the scheme. For instance, Scrivener claimed that he "wasn't aware that elderly people specifically were being called." Moreover, in urging the court to "look at all the facts of the case," Scrivener's attorney stressed that:

Jade Scrivener brought his father into this activity. Jade Scrivener rented the mailboxes; Jade Scrivener obtained a list of the phone numbers that were called. His father was not involved in the activities, but for his son bringing the father in.

The district judge did look at all the facts and found Scrivener's portrayal of his involvement in the scheme to be "incredible." This finding does not amount to clear error in light of the evidence before the court.

That evidence reveals that during the week of August 21 through August 28, 1997, the Scriveners rented separate rooms at a motel in Costa Mesa. When the Scriveners were arrested, Jade possessed two 7–Eleven phone cards, and the defendant possessed MCI and Thrifty phone cards. All fraudulent calls made on the MCI and Thrifty phone cards originated from motel rooms rented by John Scrivener whereas all fraudulent calls made on the 7–Eleven cards originated from rooms rented by his son. John Scrivener made no effort to explain away or accept responsibility for this damaging evidence. This,

however, was his burden under U.S.S.G. § 3E1.1(a), and he clearly failed to meet it. *See Innie,* 7 F.3d at 848; *see also Fellows,* 157 F.3d at 1202 (affirming district court's denial of acceptance reduction where district judge questioned sincerity of defendant's letter of remorse submitted prior to sentencing).

Scrivener's attempts to distinguish cases relied on by the government are unavailing. Scrivener characterizes *Ramos, United States v. Smith,* 905 F.2d 1296 (9th Cir.1990), and *United States v. Martinez–Gonzalez,* 962 F.2d 874 (9th Cir.1992), as standing for the proposition that a defendant's minimization of his conduct or false statement to the court must be "extreme." These cases, however, cannot bear the interpretive weight Scrivener places upon them. Simply put, the misrepresentations present in *Ramos, Smith,* and *Martinez–Gonzalez* are no more or less egregious than Scrivener's own attempts to minimize the nature of his illegal conduct.

Scrivener's attempts to distinguish *United States v. Sayetsitty,* 107 F.3d 1405 (9th Cir.1997), and *United States v. Magana–Guerrero,* 80 F.3d 398 (9th Cir.1996), are equally unimpressive. Both cases unremarkably held that a criminal defendant should not lie to a federal district court judge. *See Sayetsitty,* 107 F.3d at 1410; *Magana–Guerrero,* 80 F.3d at 402. Although Scrivener baldly asserts that these cases are factually distinct, the district judge obviously saw the matter differently. Moreover, even assuming these cases are inapposite and that Scrivener did not lie to the district court, Scrivener has cited no cases which require a district court to credit a defendant's cursory expressions of contrition. Indeed, none exist. The district judge was in a unique position to evaluate Scrivener's acceptance of responsibility, and his evaluation of the defendant's acceptance of responsibility is entitled to great deference.

In sum, Scrivener failed to "clearly demonstrate acceptance of responsibility" for his role in the telemarketing scheme, and the district court did not clearly err in denying him a two-level sentence reduction.

B

We review a district court's determination of the amount of loss for clear error. *See United States v. Lopez,* 64 F.3d 1425, 1427 (9th Cir.1995). "A district court's evaluation of the reliability of evidence is reviewed for an abuse of discretion." *United States v. Ponce,* 51 F.3d 820, 828 (9th Cir.1995) (citation omitted).

The Sentencing Guidelines' application notes indicate that "in the case of 'jointly undertaken criminal activity,' the defendant should be held accountable for the conduct of others that was both: '(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.'" *United States v. Blitz,* 151 F.3d 1002, 1012 (9th Cir.1998) (quoting U.S.S.G. 1B1.2, comment. (n.2)). Under the Sentencing Guidelines, "[t]he court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n.9); *see United States v. Niven,* 952 F.2d 289, 291 (9th Cir.1991). The Sentencing Guidelines also provide that estimates of loss in fraud cases "may be based on the approximate number of victims and an estimate of the average loss to each victim." U.S.S.G. § 2F1.1, comment. (n.9); *United States v. Koenig,* 952 F.2d 267, 271–72 (9th Cir.1991) (affirming district court's method of loss calculation where court multiplied average value of counterfeit ATM cards by the number of cards defendants had attempted to make).

The district court based the nine-level enhancement upon the recommendation contained in the presentence report, which identified ten solicitations involving known actual loss of $18,350 and twelve solicitations involving known intended loss totaling $41,350. The Probation Officer divided this total dollar amount by twenty-two, yielding an average loss of $2,714 per solicitation. The Probation Officer then

multiplied the average loss by 120 which represented the total number of out-of-state calls placed on the calling cards that the police confiscated from the Scriveners.

Scrivener first argues that the sampling of victims from which the Probation Officer computed the loss was too small. Specifically, Scrivener contends that thirteen percent [2] is too low of a figure from which to extrapolate a statistically reliable sample for purposes of the "reasonable estimate" required by the Sentencing Guidelines. In support of this argument, Scrivener notes that some of the Second Circuit cases relied on by the government contained statistical samples closer to twenty percent than the thirteen percent sample present here.[3] This argument misses the mark. Scrivener does not argue (nor could he) that these cases establish a statistical floor such that any percentage below twenty is inherently unreliable. Indeed, as the comment to U.S.S.G. § 2F1.1 states, the estimated loss resulting from Scrivener's fraud "need not be determined with precision." U.S.S.G. § 2F1.1, comment (n.8); accord United States v. Watson, 118 F.3d 1315, 1319 (9th Cir.1997). We are satisfied that the statistical sample employed here is a reasonable estimate of the loss.

Scrivener also challenges the presentence report's attribution of average known loss to the 120 out-of-state calls where no loss figure could be determined. He argues that the district court improperly assumed that all 120 phone calls listed in the records were part of the telemarketing scheme. This argument fails. The district court made no such assumptions. The record overwhelmingly indicates that there was no plausible explanation for Scrivener's calls to these elderly individuals other than to defraud them. Indeed, at sentencing, the government challenged the defendant to present an innocent explana-tion to rebut the substantial evidence suggesting that the 120 calls were made with the intent to defraud elderly persons. Scrivener offered nothing.

Accordingly, because the loss figure adopted by the district court was based upon a method contemplated by the Sentencing Guidelines, it cannot be said that the district court clearly erred in adopting the loss figures calculated by the Probation Officer.

## C

■■ This court reviews de novo the district court's interpretation and application of the Sentencing Guidelines. See United States v. Randall, 162 F.3d 557, 560 (9th Cir.1998). This court reviews for clear error a district court's finding that a defendant's victims were unusually vulnerable. See id.

■ Section 3A1.1 of the Sentencing Guidelines "will apply to increase the offense level where (1) a victim was either (a) unusually vulnerable due to age, physical, or mental condition, or (b) otherwise particularly susceptible to the criminal conduct, and (2) the defendant knew or should have known of such vulnerability or susceptibility." United States v. Castellanos, 81 F.3d 108, 110 (9th Cir.1996). Actual or constructive knowledge of the victim's vulnerability suffices for the enhancement under U.S.S.G. § 3A1.1(b) to apply. See United States v. O'Brien, 50 F.3d 751, 755–56 (9th Cir.1995).

■ Notwithstanding Scrivener's cursory attempts to argue to the contrary, it is beyond dispute that elderly victims are susceptible to telemarketing fraud. See, e.g., United States v. Caterino, 957 F.2d 681, 684 (9th Cir.1992) (affirming vulnerable victim enhancement for telemarketing offense against elderly victims "who don't

---

2. The percentage is based on the 176 total calls identified by the case agent in relation to the twenty-two calls used as a sample.

3. These cases include United States v. Bryant, 128 F.3d 74,76 (2d Cir.1997); United States v. Sutton, 13 F.3d 595, 597–600 (2d Cir.1994); and United States v. Lohan, 945 F.2d 1214, 1218–19 (2d Cir.1991).

have the ability to protect themselves"); *accord United States v. O'Neil,* 118 F.3d 65, 75 (2d Cir.1997) ("[C]ourts frequently have found elderly individuals to be unusually vulnerable to telemarketing fraud schemes.").

Scrivener's effort to distance himself from having possessed any knowledge that his victims were elderly is equally unimpressive. The record contains an abundance of evidence indicating that the defendant knew or should have known that his victims were elderly. For instance, the Probation Officer stated that a reasonable person would have concluded by the sound of their voices over the telephone that the solicited victims were elderly. Similarly, both Scriveners admitted to working from "lead sheets" of potential elderly victims, many of whom had been victimized successfully in the past by other fraudulent "sweepstakes" schemes.

Finally, the record demonstrates that the Scriveners' victims were, in fact, elderly. Indeed, of the thirty-six identifiable victims in this case, only two were under sixty years of age, and more than fifty percent were at least eighty years old. Given John Scrivener's active involvement in the telemarketing scheme and the voluminous number of calls attributable to him, it cannot be said that he did not know that his victims were of a particularly vulnerable age.

Accordingly, because the victims of the Scriveners' scheme were especially susceptible, and John Scrivener knew or should have known that these victims were elderly, the district court did not err in applying the vulnerable victim enhancement.

### D

■ A district court's decision to depart from the Sentencing Guidelines engenders review for abuse of discretion. *See United States v. Sanchez-Rodriguez,* 161 F.3d 556, 559 (9th Cir.1998). Under this standard, we "give 'substantial deference' to the district court's decision to depart, 'for it embodies the traditional exercise of discretion by a district court.'" *Id.* at 559 (quoting *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996)).

■ A district court may impose a sentence outside of the applicable Sentencing Guidelines range if the court determines "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the ... guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). In other words, a sentencing court may depart upward from the sentence dictated by the Sentencing Guidelines if an aggravating factor or circumstance is present to an exceptional degree or is of a kind not adequately taken into consideration by the Sentencing Guidelines. *See Koon,* 518 U.S. at 95, 116 S.Ct. at 2045. "Whether or not a factor makes a case unusual is a determination particularly suited to the district court, 'informed by its vantage point and day-to-day experience in criminal sentencing.'" *Sanchez-Rodriguez,* 161 F.3d at 561 (quoting *Koon,* 518 U.S. at 98, 116 S.Ct. at 2046).

■ Scrivener challenges the upward departure on the ground that the district court already addressed the harm suffered by his elderly victims when it imposed the two-level vulnerable victim enhancement under U.S.S.G. § 3A1.1(b). Scrivener argues that the district court abused its discretion by impermissibly "double-counting."[4] We disagree.

The § 5K2.0 departure was based on the district court's conclusion that the fraud provisions of the Sentencing Guidelines do not adequately take into consideration the unique evils inherent in telemarketing

---

4. Double-counting occurs where "one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *United States v. Reese,* 2 F.3d 870, 895 (9th Cir.1993).

fraud upon the elderly. It based this conclusion, in part, upon the government's argument that the Senior Citizens Against Marketing Scams Act (the "SCAMS Act"), 18 U.S.C. § 2325 et seq., manifests Congress' view that the Sentencing Guidelines do not adequately punish defendants who target the elderly, a particularly gullible class that Congress has separately attempted to protect. We agree with the district court.

Telemarketing fraud against the elderly has prompted federal legislation such as the SCAMS Act over the past several years. As relevant here, the SCAMS Act provides:

§ 2326. Enhanced penalties. A person who is convicted of an offense under section 1028, 1029, 1341, 1342, 1343, or 1344 in connection with the conduct of telemarketing—

(1) may be imprisoned for a term of up to 5 years *in addition* to any term of imprisonment imposed under any of those sections, respectively; and

(2) in the case of an offense under any of those sections that

(A) victimized ten or more persons over the age of 55; or

(B) targeted persons over the age of 55, may be imprisoned for a term of up to 10 years in addition to any term of imprisonment imposed under any of those sections, respectively.

18 U.S.C. § 2326 (emphasis added); *see also* 139 Cong. Rec. S15146–01, *S15148 (daily ed. Nov. 5, 1993) (statement of Sen. Hatch) (explaining that the SCAMS Act "criminaliz[es] telemarketing fraud and enhances penalties for these crooked acts when senior citizens are the principal victims").

Although this court has not had occasion to address the precise interplay between the vulnerable victim enhancement under the Sentencing Guidelines and the SCAMS Act, the district court's decision to depart upward comports with the holdings of both the Tenth and Sixth Circuits. In *United States v. Smith*, 133 F.3d 737 (10th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2306, 141 L.Ed.2d 165 (1998), the court considered and rejected a challenge to an upward departure on the ground that the Sentencing Guidelines adequately addressed the defendant's conduct. The court explained that:

The foci of the vulnerable victim enhancement and the SCAMS Act differ on two key dimensions. The SCAMS Act is directed toward criminal telemarketing conduct targeted at or actually victimizing a certain class of individuals, statutorily defined as those over the age of fifty-five. The Act requires the offense target the elderly as a class. In contrast, the vulnerable victim enhancement does not require a finding the defendant targeted the victim because of his vulnerability. Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged. A single vulnerable victim is sufficient to support application of the enhancement. Thus, the focus of the SCAMS Act and that of the vulnerable victim enhancement differ in key respects and are sufficiently distinct to avoid double counting the same offense conduct.

*Id.* at 749 (citations omitted). In *United States v. Brown*, 147 F.3d 477, 487 (6th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 270, 142 L.Ed.2d 223 (1998), "a case involving a telemarketing scheme very similar to the one engaged in by [the defendant in *Smith* ]," the Sixth Circuit relied on the analysis in *Smith* in concluding "that the district court could properly depart upward based on the SCAMS Act even though Brown also received a two-level enhancement for vulnerable victims under § 3A1.1(b)."

We adopt the sound reasoning of our sister circuits in rejecting Scrivener's double-counting argument. While the district court did not increase the penalties pursuant to the SCAMS Act, it did utilize the rationale behind the SCAMS Act and similar legislation as the bases for its upward

departure. Accordingly, we conclude that the fraud provisions of the Sentencing Guidelines do not adequately punish the reprehensible conduct at issue here and that the SCAMS Act and the vulnerable victim enhancement are sufficiently distinct to avoid double-counting. This conclusion is buttressed by the recent passage of the Telemarketing Fraud Prevention Act of 1998, Pub.L. No. 105–184, 112 Stat. 520 (1998) (the "TFPA"), in which Congress took additional steps to eradicate telemarketing fraud against the elderly. In the TFPA, Congress explicitly directed the Sentencing Commission to amend the Sentencing Guidelines "to provide for substantially increased penalties for persons convicted of [telemarketing fraud.]" *Id.* § 6(b).[5]

Moreover, even if the Sentencing Guidelines did account for the unique harms posed by telemarketing fraud against the elderly, the district court reasonably could have concluded that the vulnerability of the victims was present to an exceptional degree in this case. *See, e.g., Koon,* 518 U.S. at 96, 116 S.Ct. at 2045 (noting that upward departures are permissible "if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present"). The court, in making its departure decision, considered the evidence presented at sentencing suggesting that the Scriveners' elderly victims had been harmed in ways not adequately addressed by the Sentencing Guidelines. For instance, some victims poignantly articulated feelings of shame. Others expressed a complete loss of dignity. Many stated that because they depended on a fixed income, the money stolen from them was irreplaceable and had caused them to miss bill payments. The district judge was in a unique position to evaluate this evidence, and we will not substitute our judgment for the district judge's superior "vantage point and day-to-day experience in criminal sentencing." *Sanchez–Rodriguez,* 161 F.3d at 561 (quotation omitted).

In view of these principles, it is clear that the district court did not abuse its discretion when it imposed a two-level statutory departure.

### E

 We review a district court's finding that a defendant has sufficient financial resources to pay a fine for clear error. *See United States v. Ladum,* 141 F.3d 1328, 1344 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998).

 Scrivener contends that the district court erred when it imposed the $9,000 fine, arguing that the record does not support a finding that he had the present or future ability to pay. Scrivener, however, did not object to the imposition of this fine at sentencing. Generally, parties must raise objections to factual findings at sentencing in order to preserve the issue on appeal. *See United States v. Kelly,* 993 F.2d 702, 704 (9th Cir.1993); Fed.R.Crim.P. 32(c)(1). Absent such an objection, this court may consider the issue only where "exceptional circumstances" exist. *United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir.1991). Where the "exceptional circumstances" exception applies, we review the disputed factual determination under a plain error standard. *See United States v. Hernandez–Rodriguez,* 975 F.2d 622, 628 (9th Cir.1992).

Scrivener notes that his son's attorney objected to the imposition of the same fine. He therefore asserts that "a similar objection by the defendant would no doubt have yielded the same result." This assertion lacks merit. Scrivener cites no legal authority for the proposition that a defense

---

5. The Sentencing Commission responded to this directive by voting to amend § 2F1.1 (Fraud and Deceit) to increase penalties for offenses involving "sophisticated means," *see* U.S.S.G. § 2F1.1(b)(5), and to amend § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) to enhance penalties for offenses that involve a large number of vulnerable victims, *see* U.S.S.G. § 3A1.1(b)(2). As the effective date of this amendment was November 1, 1998, *see* U.S.S.G. App. C, amend. 587 (Supp.1998), these modifications are inapplicable to the instant case.

**954**

counsel's clairvoyant ability to read a district judge's mind triggers the "exceptional circumstances" exception. Moreover, objections made by Jade Scrivener were relevant only for purposes of determining his own ability to pay. His father's wholly separate financial circumstances logically required a separate objection. Certainly, if exceptional circumstances had existed, John Scrivener would not have relied on co-counsel to make his objections for him. In any event, the Sentencing Guidelines require a fine of between $7,500 and $75,-000 for an offense level of twenty-one. *See* U.S.S.G. § 3E1.2(c)(3). The $9,000 figure thus represents a fine falling at the low end of the range of potential fines. Accordingly, even if exceptional circumstances were present in this case, we would be unable to find that the district court plainly erred when it imposed the $9,000 fine.

## III

For the foregoing reasons, we affirm each of the district court's sentencing decisions.

AFFIRMED.